# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 371 | **DATE** | 8/6/2003 |
| **CASE TITLE** | Kaukab vs. Harris | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant Harris' motion to dismiss first amended complaint against him is denied [12, 61-1, 61-2]. Defendant Harris' motion to strike plaintiff's requests for declaratory relief [61-3] is granted. Defendant Argenbright's motion to dismiss plaintiff's free exercise claims [14-1] is denied. Defendant Argenbright's motion to strike [59-1] and dismiss [59-2] plaintiff's requests for declaratory relief is granted. Status hearing is set for 10/21/03 at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7  number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | AUG - 7 2003  date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | IS  docketing deputy initials | 114 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | 03 AUG -6 PM 4:21 | 8/6/2003  date mailed notice | |
| MD | courtroom deputy's initials | FILED FOR DOCKETING  1-03 | MD  mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAMAR KAUKAB, ) | |
| ) | **DOCKETED** |
| ) | AUG - 7 2003 |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 02 C 0371 |
| ) | Judge Joan H. Lefkow |
| MAJOR GENERAL DAVID HARRIS, ) | |
| SPC REUBEN VARGAS, ) | |
| ARGENBRIGHT SECURITY, INC., ) | |
| MIKHY APPLING, ) | |
| TIKAYLA EWING-WILLIAMS and ) | |
| SHAWNA JONES, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Samar Kaukab, who is a United States citizen of Pakistani and South Asian descent and a practicing Muslim, filed a three-count civil rights complaint after she was detained at O'Hare International Airport ("O'Hare Airport") on November 7, 2001while passing through airport security and ultimately "strip searched." She has sued Major General David Harris ("General Harris"), Adjutant General of the Illinois Army and Air National Guard (the "Illinois National Guard"), Reuben Vargas, a member of the Illinois National Guard, Argenbright Security, Inc. ("Argenbright"), a contract security services provider for United Airlines, and three Argenbright employees, Mikhy Appling, Tikayla Ewing-Williams and Shawna Jones,[1] for damages and declaratory relief. Kaukab alleges under 42 U.S.C. § 1983 that defendants violated her First Amendment right to free exercise of her religion, her Fourth Amendment right to be free

---

[1] Defendants Appling, Ewing-Williams and Jones are represented by counsel for Argenbright. Defendants General Harris and Vargas are represented by the United States Department of Justice.

1

114

from unreasonable search and seizure, and her Fourteenth Amendment right to equal protection of the laws (Count I). She also claims that defendants, based on plaintiff's race, ancestry, color and/or ethnicity, deprived her of the full enjoyment of all the benefits, privileges, terms and conditions of her passenger contract with United Airlines (Count II). Finally, plaintiff claims that Argenbright, Appling, Ewing-Williams and Jones (collectively, Argenbright or "the security staff") falsely imprisoned and committed battery against her in violation of Illinois common law (Count III). Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1332, 1343(a)(3), 1343(a)(4) and 1367. For present purposes, it is sufficient to conclude that jurisdiction rests in 28 U.S.C. §§ 1343(a)(3) and (4) and 1367.

Before this court are General Harris' motion pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss the First Amended Complaint against him; Argenbright's Rule 12(b)(6) motion to dismiss Kaukab's free exercise claims; and both Argenbright's and General Harris' Rule 12(b)(1) motions to strike and dismiss Kaukab's requests for declaratory relief. For the reasons set forth below, the court denies General Harris' motion to dismiss, denies Argenbright's motion to dismiss Kaukab's free exercise claims, and grants the motions to strike and dismiss Kaukab's requests for declaratory relief.

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *General Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of her

2

claim that would entitle her to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957); *Sanville* v. *McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001). In ruling on motions to dismiss, the court accepts as true all well-pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in the plaintiff's favor. *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002); *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999).

## FACTS

The facts as alleged in the First Amended Complaint, taken as true, are as follows:

### A.  The parties

Kaukab, who was 23 years old at the time of the incident at issue, was born and lives in the United States. As already noted, she is of Pakistani and South Asian descent and is a practicing Muslim. In accordance with her religious beliefs, which require modesty in her public appearance, Kaukab covers her hair and neck with a scarf called a "hijab" at all times in public. Kaukab resides in Columbus, Ohio. She works for Volunteers In Service To America (VISTA), a national service program where members work with non-profit or public agencies. As part of her job, she is required to travel.

Apart from the Governor, who is Commander-in-Chief, General Harris is the senior officer for the Illinois National Guard. He is responsible for the daily operations of the Illinois National Guard, including ensuring the adequate training of its members. Kaukab sues General Harris in his individual capacity for declaratory relief and money damages under Counts I and II.

Vargas is a member of the Illinois National Guard. He was present and responsible for monitoring the passenger security screening checkpoint (the "checkpoint") located at Terminal 1 in O'Hare Airport at all relevant times. Kaukab sues Vargas in his individual capacity for

declaratory relief and money damages under Counts I, II and III.

Argenbright is a Georgia corporation with its principal place of business in Atlanta, Georgia. At all relevant times, Argenbright provided passenger security screening services at Terminal 1 pursuant to a contract with United Airlines ("United"). Kaukab sues Argenbright directly in Count I for violation of her civil rights and on the basis of *respondeat superior* for the § 1981 and Illinois tort claims. Kaukab seeks declaratory relief and money damages against Argenbright on all counts.

Appling, Ewing-Williams and Jones were, at all relevant times, security staff for Argenbright at Terminal 1. Kaukab sues the security staff in their individual capacities for declaratory relief and money damages in Counts I, II and III.

### B.     Alleged events leading to the instant lawsuit

According to the First Amended Complaint, during early November 2001, Kaukab attended a VISTA conference in Chicago. On November 7, 2001, she went to O'Hare Airport to fly home to Columbus. She was wearing pants, a long sweater and ankle-length boots as well as her hijab. She carried a purse and a small bag.

After entering Terminal 1, Kaukab checked one suitcase with United Airlines and then, along with a group of other VISTA conference attendees, joined the line of passengers waiting to go through the security checkpoint. Periodically, a person walked through the metal detector set it off. This happened three times while Kaukab waited in line. When this happened, the security staff did a quick, relatively unintrusive additional search with a hand-held metal detector and then sent the person on her or his way. Moreover, Kaukab noticed that a woman wearing a scarf on her head and individuals who wore baseball caps walked through the checkpoint without

4

being stopped or asked to remove the scarf or caps. (First Am. Compl. ¶¶ 45-46.) None of these people, however, appeared to be of Pakistani or South Asian descent. Furthermore, none of these people wore articles of clothing that would identify them as of the Muslim faith. Eventually, Kaukab sent her bags through the x-ray machine and walked through the metal detector without setting it off. When Kaukab went to retrieve her bags, however, Vargas instructed the security staff to stop and search her. From this point forward, Kaukab did not feel free to leave the checkpoint.

*1.    The search at the checkpoint*

The security staff surrounded Kaukab as if to prevent her from leaving the checkpoint. At the direction of Vargas, the security staff searched Kaukab multiple times with a hand-held metal detector. Appling first searched Kaukab with the detector while Ewing-Williams stood nearby and watched. After Appling finished, Vargas instructed him to search Kaukab again, pointing to her head. Appling then conducted a second search with the detector, this time more slowly, covering more surface area of Kaukab's head and body. Vargas and Ewing-Williams watched closely as Appling conducted the search.

After the second search, Vargas and the security staff had a discussion. Appling then gave Ewing-Williams the detector. Ewing-Williams ran the detector over Kaukab's upper body, down her legs and her "crotch" area. Ewing-Williams also stuck the detector in Kaukab's boots. She then conducted a pat-down of Kaukab. Ewing-Williams pulled the hook and straps of Kaukab's bra and asked Kaukab to lift her sweater. She then ran the detector over the portion of Kaukab's lower body that had been covered by her sweater. Ewing-Williams also repeatedly ran the detector carefully over Kaukab's head. Despite numerous and extensive passes over and

5

around Kaukab's head, the detector produced no audible signal. Vargas, however, glared at Kaukab as the security staff carried out his orders to search her.

During the course of this search, a crowd of people also began to gather around Kaukab. Kaukab felt embarrassed and humiliated.

2.  *The requests for Kaukab to remove her hijab*

After Ewing-Williams completed her pat-down and search, Appling spoke with Vargas. Thereafter, Appling demanded that Kaukab remove her hijab. Kaukab explained that she could not remove her hijab in public for religious reasons. Still, Appling insisted that Kaukab remove her hijab. This time, Kaukab stated that she would remove her hijab in a private room or behind a screen and only in front of a woman. Appling spoke again with Vargas. After their conversation, Appling again demanded that Kaukab take off her hijab in public. Vargas stood nearby, continuing to glare at Kaukab in an intimidating manner, apparently to ensure that she would remove her hijab. Feeling violated and upset by the demands to remove her hijab, Kaukab repeatedly stated that she would not remove her hijab for religious reasons in public or in front of a man. Kaukab was angered and offended by Vargas' and the security staff's insensitivity to her religious beliefs and practices and her attendant desire for modesty.

After a lengthy discussion among the security staff and Vargas, Appling ordered Kaukab to follow him. As Kaukab proceeded to follow Appling, the security staff "guarded" her as if to prevent her from leaving. When the security staff found a private room, Appling insisted that he search Kaukab while his female colleagues stood outside to guard the door. Kaukab responded again that she only would remove her hijab in front of a woman for religious reasons. Kaukab felt harassed and scared. Finally, after Kaukab's repeated insistence, the security staff agreed that

6

Kaukab would go into the room with Ewing-Williams and Jones.

### 3.  *The search in the private room*

Kaukab entered the small room with Ewing-Williams and Jones. Ewing-Williams then conducted a "demeaning and overly intrusive search" of Kaukab's head. (*Id.* ¶ 35.) Ewing-Williams told Kaukab to remove her hijab and Kaukab complied. Ewing-Williams ran her fingers through Kaukab's hair and touched and rubbed Kaukab's scalp and neck.

Despite Kaukab's compliance with the demand to remove her hijab, Ewing-Williams proceeded to perform a complete body search. Ewing-Williams patted Kaukab down over her sweater. She made Kaukab lift her arms out to the side and felt her arms, including her armpits. Ewing-Williams felt Kaukab's neck and around her collarbone. She then patted over Kaukab's sweater and back and pulled on the hooks and straps of Kaukab's bra. She patted Kaukab's chest and her breasts and pulled Kaukab's bra from the center and sides.

Ewing-Williams opened Kaukab's sweater in the front, which exposed the camisole that Kaukab wore underneath her sweater. Ewing-Williams viewed Kaukab's camisole and patted over it. Ewing-Williams then covered her hand with Kaukab's camisole and placed her hand inside Kaukab's bra, patting down her breasts. She then patted the rest of Kaukab's upper body over the camisole. Following the upper body search, Ewing-Williams patted the front, back and sides of Kaukab's thighs and the front of her lower legs. She unzipped Kaukab's boots and felt around inside her boots over her socks. She then patted the backs of Kaukab's legs, buttocks and crotch. Ewing-Williams unbuttoned and unzipped Kaukab's pants and viewed Kaukab's underwear. She placed her hand inside Kaukab's pants, patting her over her underwear around her lower abdominal area and crotch. Ewing-Williams zipped Kaukab's pants back up and ran

7

her hands over Kaukab's entire crotch area again. She then pushed on Kaukab's crotch. Ewing-Williams forced Kaukab's legs farther apart and said, "spread your legs." (*Id.* ¶ 39.) She then conducted a more extensive search of Kaukab's crotch area. Ewing-Williams further placed her hands inside the top of Kaukab's pants. Throughout this time, Jones watched Ewing-Williams conduct the search.

Suddenly, other security staff opened the door and told Kaukab to "come out." (*Id.* ¶ 40.) Kaukab said she could not do so until she put back on her hijab. Kaukab replaced her hijab without the benefit of a mirror and left the room. The security staff said nothing further to Kaukab, so she asked whether she was free to leave. The security staff told Kaukab that she was. Kaukab returned to the checkpoint to retrieve her purse and bag. During this stop and search, Vargas and the security staff found no weapons or other contraband on Kaukab.

## DISCUSSION

### A. General Harris' motion to dismiss Kaukab's First Amended Complaint

The First Amended Complaint charges that General Harris, with deliberate indifference, failed to properly train and supervise guardsmen under his command and as a consequence they "surveil, stop, detain and direct instrusive [*sic*] searches of women without sufficient legal justification and based on ethnicity, ancestry, religion and national origin." (First Am. Compl. ¶ 50.) General Harris argues that he should be dismissed as a defendant because the allegations against him fail to state an individual capacity claim under § 1983[2] and, even if they do state a

---

[2]Because plaintiff also alleges a § 1981 claim against General Harris, the court presumes that General Harris also intends to include that claim in his motion to dismiss.

claim, he is entitled to qualified immunity.[3]

1.   *Whether the complaint states a § 1983 claim against General Harris*

To establish an individual capacity claim under § 1983 against a supervisory official

> ... there must be a showing that the official was directly responsible for the improper conduct ... and knowingly, willfully, or at least recklessly caused the alleged deprivation by [her or his] failure to act ...
>
> However, a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of section 1983 if [the defendant] acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent. ...

*McPhaul v. Bd. of Comm'r of Madison County*, 226 F.3d 558, 566 (7th Cir. 2000) (internal citations and quotations omitted); *see Sanville v. McCaughtry*, 266 F.3d 724, 739-40 (7th Cir. 2001); *Kitzman-Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir. 2000) (indicating that individuals may be liable in their personal capacity for failure to train claims). As set out in *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988), to be held liable for conduct of their subordinates, supervisors must have been personally involved in that conduct. Supervisors who are negligent, even grossly negligent, in failing to detect and prevent subordinates' misconduct are not liable. *Id.* "The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly

---

[3]General Harris' motion, originally addressed to the initial complaint, also asserts Eleventh Amendment sovereign immunity, impropriety of injunctive relief and lack of liability for state law claims under Count III. Because General Harris is sued only in his individual capacity, the Eleventh Amendment bar available to the State is inapplicable. Further, plaintiff's first amended complaint, unlike the original complaint, does not seek injunctive relief and does not name General Harris a defendant in Count III. Thus, the issues raised in the motion that will be addressed herein are whether the complaint states a § 1983 claim upon which relief may be granted; whether General Harris is entitled to qualified immunity; and whether plaintiff may seek declaratory relief against General Harris.

9

or with deliberate, reckless indifference." *Id.*[4]

General Harris argues that because plaintiff cannot plead that he knew that screening would be based on national origin or religion, or that he specifically gave an order to single out passengers on those bases, he cannot be liable under § 1983. In *Kitzman-Kelly*, the court identified the Second Circuit's "three-part framework" as "a useful guide" in assessing whether a complaint stated a claim that failure to train amounted to deliberate indifference to the rights of citizens, looking at whether the complaint shows

> ... (1) that "a policy maker ... [knows] 'to a moral certainty' that ... employees will confront a given situation"; (2) that "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) that "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights."

203 F.3d at 459, quoting *Young v. Fulton*, 160 F.3d 889, 903-04 (2d Cir. 1992), and *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).[5] Kaukab argues that virtually anyone experienced in the affairs of life (including General Harris) would have known to a moral certainty that female Muslim citizen wearing full head coverings would be traveling through O'Hare security checkpoints and that security officers so confronted shortly after the September 11, 2001 attack, which had been attributed to Muslim terrorists, would be faced with a difficult

---

[4] Similarly, pursuant to § 1981, individual liability may only be found where the individual herself "participated in the alleged discrimination against the plaintiff." *Behnia v. Shapiro*, 961 F. Supp. 1234, 1237 (N.D. Ill. 1997); *Daulo v. Commonwealth Edison*, 892 F. Supp. 1088, 1091 (N.D. Ill. 1995) ("Section 1981 liability against an individual demands personal involvement in discrimination.").

[5] General Harris argues that *Kitzman-Kelly*, 203 F.3d at 458-59, also requires a "special relationship" entailing a degree of custody or control (such as a child ward or a prisoner) between the plaintiff and the State *plus* deliberate indifference. Although it is possible to read *Kitzman-Kelly* in that way, that interpretation would be inconsistent with the court's references to *Young* and *Walker*, which did not rest on a "special relationship" between the plaintiffs or the plaintiffs' wards and the *Monell* defendant.

choice whether to seize for further investigation an apparent Muslim whose clothing could conceal contraband; that training would certainly help such an officer make the appropriate decision; and that a wrong decision, such as is illustrated by Kaukab's own experience, will frequently cause the deprivation of a citizen's constitutional rights. General Harris argues that no one could have known to a moral *certainty* that someone such as plaintiff would have confronted the security staff; that the choice at issue did not concern Kaukab's civil rights but rather the safety of passengers on airplanes; and that, because this was an isolated incident, there is nothing to suggest the wrong choice will frequently cause deprivation of a citizen's constitutional rights.

General Harris's argument, however, is unpersuasive because (a) if moral certainty of the sort he describes is the standard, the term loses any meaning, and (b) General Harris cites no authority for the proposition that plaintiff's constitutional rights were justifiably denied because of the particular circumstances or that the failure to train should be excused because of the haste with which General Harris' duties were undertaken.[6] Moreover, although General Harris argues that, without a past history of similar searches, there is no way General Harris could have been deliberately indifferent to what was an unknown problem, *Kitzman-Kelly* permits knowledge to be imputed.[7] Furthermore, Kaukab points to United States Department of Transportation directives to airlines, issued during September, 2001, emphasizing the need to avoid

---

[6]General Harris's citation of *Lanigan v. Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 472 (7th Cir. 1997), and *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985), for the proposition that plaintiff must allege a policy of placing guardsmen at the airport without adequate training inappropriately incorporates principles applicable to municipal liability. Policy allegations, as indicated above, are not necessary to state a claim against an official in his individual capacity.

[7]*Kitzman-Kelly*'s use of the term "know to a moral certainty" imputes knowledge under such circumstances. Moreover, the case indicates that it is not necessary to plead and prove a history of constitutional violations if, alternatively, the plaintiff can demonstrate that the subordinates inclined to act improperly could be deterred through proper training. 203 F.3d at 459.

11

discrimination based on passengers' names or modes of dress, implying that General Harris was or must have been aware. In short, notwithstanding the obvious difficulties plaintiff faces in proving recklessness amounting to deliberate indifference, the court concludes that the complaint states a claim upon which relief may be granted.[8]

2.   *Whether General Harris is entitled to qualified immunity*

Because the court has concluded that Kaukab has stated a claim against General Harris, his qualified immunity defense must be addressed. "Qualified immunity is available unless the rules of law on which plaintiffs rely are so clearly established that a reasonable state actor is bound to understand how they apply to the situation at hand." *West* v. *Schwebke*, 333 F.3d 745, 748-49 (7th Cir. 2003), citing *Saucier* v. *Katz*, 533 U.S. 194 (2001), and *Anderson* v. *Creighton*, 483 U.S. 635 (1987). The court uses a two-step analysis to determine whether an official is entitled to qualified immunity: "(1) whether the alleged conduct sets out a constitutional violation," (addressed in Part A.1. above); "and (2) whether the constitutional standards were clearly established at the time of the violation." *Lanigan* v. *Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 472 (7th Cir. 1997). To paraphrase *Hope* v. *Pelzer*, 536 U.S. 730, 741 (2002), the salient question is whether the state of the law in November, 2001 gave General Harris fair warning that the alleged treatment of Kaukab would be unconstitutional.

The right of a person to be free from being profiled for purposes of search and seizure

---

[8]The court acknowledges General Harris' argument at pages 6-7 of his brief in which he accuses Kaukab of basing her claim on a "flawed legal theory." It is true, as he points out, that *Monell*-type cases presume that a constitutional violation has occurred and then ask whether the municipality itself may be liable. But the same is true for supervisor liability. It is assumed for purposes of the motion that subordinates violated plaintiff's constitutional rights and the question is whether General Harris is responsible in his individual capacity. Kaukab's theory, therefore, is not flawed.

12

based on one's apparent Muslim religion or apparent Arab ethnicity was, General Harris concedes, clearly established in November, 2001. Thus, General Harris is not immune from suit. *See Harlow* v. *Fitzgerald*, 457 U.S. 800, 818-19 (1982) ("If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.").

B.  **Argenbright's motion to dismiss Kaukab's free exercise claims[9]**

The Free Exercise Clause of the First Amendment "provides considerable, though not absolute, protection for the ability to practice (through the performance or non-performance of certain actions) one's religion." *United States* v. *Indianapolis Baptist Temple*, 224 F.3d 627, 629 (7th Cir. 2000). Kaukab alleges that defendants' actions in "harassing, penalizing and retaliating against" her based on her Muslim beliefs violated her rights under the Free Exercise Clause. (First Am. Compl. ¶ 55.) Argenbright contends there is no constitutional violation because they (eventually) acceded to Kaukab's protestations that she only may remove her hijab in private and in front of a woman. Alternatively, Argenbright argues that, even if it burdened Kaukab's free exercise of religion, its conduct was justified by a compelling governmental interest in airport security, citing federal regulations prohibiting a passenger from boarding an airplane "without submitting to the screening and inspection of his or her person and accessible property in accordance with the procedures being applied to control access to" the airplane. 49 C.F.R. § 1540.107; *see also* 49 U.S.C. §§ 44901 *et seq.*

Kaukab's "third claim for relief" claims simply that she was punished with an extraordinarily intrusive search solely because she adhered to her religious belief. Her

---

[9]Defendants Appling, Ewing-Williams and Jones join Argenbright's motion.

13

allegations support this Free Exercise claim. *Accord, Employment Dir. Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990) ("The government may not . . . punish the expression of religious doctrines it believes to be false . . . [or] impose special disabilities on the basis of religious views or religious status."); *Mt Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 283-84 (1977) (even though the teacher could have been fired for "no reason," the school board could not fire him because he engaged in protected speech).[10] For these reasons, the motion to dismiss the Free Exercise claim is denied.

C.  **Argenbright's motion to dismiss and strike Kaukab's requests for declaratory relief**

Argenbright moves to strike and dismiss Kaukab's requests for declaratory relief for lack of standing because at the time Kaukab filed her lawsuit there was no likelihood that she would experience the same treatment by Argenbright in the future, thus she asserts no actual case or controversy. Similarly, General Harris contends that the case against him concerns only past conduct, adding that the requested declaratory relief does not even seek a declaration regarding his failure to train. Plaintiff responds that the likelihood of the same treatment may still exist, or

---

[10]To the extent, however, that plaintiff is claiming that the facially neutral law which permits security staff to search under hijabs as well as any other clothing on the person is an unjustified burden on her free exercise rights, she is on less solid ground. In order for such a claim to withstand the motion, plaintiff must allege that the facially neutral law authorizing the security staff to search all persons is a covert effort to discourage or restrict a religious practice of wearing a hijab. *See, Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (where the covert governmental purpose was suppression of central element of Santeria worship service, and law was not neutral or of general applicability, the Free Exercise clause was violated). In that instance, the law would be invalid unless justified by a compelling interest and narrowly tailored to advance that interest. *Id.* at 533. But such motive does not seem to be a permissible inference from the facts alleged or from plaintiff's argument. Rather, the facts set out what amounts to retaliation, as indicated, as well as the Count I equal protection claim: that plaintiff was singled out for the intrusive search on the basis of her apparent religious belief or as a direct incident of her religious beliefs. *See Schroeder v. Hamilton School Dist.*, 282 F.3d 946, 951 (7th Cir. 2002) ("The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action" plus proof of discriminatory purpose. In other words, "that a decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.").

at least that declaratory relief is appropriate notwithstanding and, further, if the prayer for relief is inadequate to reach General Harris, she requests leave to amend.

"The standing requirement inheres in Article III of the Constitution, which requires that a party seeking to invoke the jurisdiction of the federal courts must present an 'actual case or controversy.'" *Perry* v. *Sheahan*, 222 F.3d 309, 313-14 (7th Cir. 2000), quoting *City of Los Angeles* v. *Lyons*, 461 U.S. 101, 103 (1983). This requirement ensures that a plaintiff has "a personal stake in the outcome[.]" *Perry*, 222 F.3d at 313 (internal citations and quotations omitted). To establish standing, a plaintiff must show (1) injury in fact, meaning an invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of such that the injury is fairly traceable to the defendants' actions; and (3) that a favorable decision is likely to redress the injury. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Where on a motion to dismiss "standing is challenged as a factual matter, the plaintiff bears the burden of supporting the allegations necessary for standing with 'competent proof.'" *Retired Chicago Police Ass'n* v. *City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996) (further stating, "[W]e have interpreted 'competent proof' as requiring a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists.").

Argenbright relies on evidence that (1) prior to Kaukab's filing her instant action (January 16, 2002), on November 19, 2001, Congress passed the Aviation Transportation Security Act (the "ATSA"), 49 U.S.C. §§ 44901 *et seq.*, vesting the Transportation Security Administration ("TSA") with the responsibility for directing and conducting all security screening services at the nation's airports; (2) on September 10, 2002, Argenbright ceased performing passenger security

15

screening services at O'Hare Airport; and (3) between November 7, 2001 and June 24, 2002, Kaukab traveled between Columbus and Chicago approximately seven times on an airplane and was not improperly detained and searched by Argenbright employees except for the one alleged incident on November 7, 2001. Based on these facts, Argenbright asserts that Kaukab cannot meet the injury-in-fact and redress of injury requirements to show standing.

In response, Kaukab dismisses the standing argument and argues that the controversy between Argenbright and herself is one for which a judgment declaring the rights of the parties is appropriate, even though her prayer for injunctive relief has been mooted by subsequent events. She contends that this is particularly appropriate in the context of a civil rights case filed "to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." (Pl. Resp. at 12, quoting *City of Riverside* v. *Rivera*, 477 U.S. 561, 574 (1986) (which, by the way, was not concerned with the appropriateness of declaratory relief)). Based on her response, defendants assert that plaintiff improperly confuses standing with mootness.

In the simplest terms, standing is separated from mootness as follows: If at the time Kaukab filed her case, there was no case or controversy which declaratory relief could resolve, she lacked standing. If, on the other hand, there was a case or controversy when she filed her case, but now there is no longer a case or controversy, the case is moot.[11] Where the record

---

[11]In *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167 (2000), the Supreme Court determined a court must address standing before mootness. The Court distinguished the concepts of standing and mootness, stating in pertinent part:

> ... if mootness were simply "standing set in a time frame," the exception to mootness that arises when the defendant's allegedly unlawful activity is "capable of repetition, yet evading review," could not exist. When, for example, a mentally disabled patient files a lawsuit challenging her confinement in a segregated institution, her postcomplaint transfer to a community-based program will not moot the action, *Olmstead* v. *L.C.*, 527 U.S. 581, 594, n. 6 ... (1999), despite the fact that she would have lacked initial standing had she filed the complaint after the transfer. Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the

16

reflects that Argenbright continued to provide security services at O'Hare Airport beyond the date on which plaintiff filed her complaint, there is ample authority for the conclusion that she has standing notwithstanding the resolution of the claim for injunctive relief. *E.g., Black* v. *Brown*, 513 F.2d 652, 653-55 (7th Cir. 1975) ("The fact that new regulations had been adopted by prison officials subsequent to the factual events of this case, does not moot plaintiff's claim for either declaratory or monetary relief."); *Penny Saver Publications, Inc.* v. *Village of Hazel Crest*, 905 F.2d 150, 154-54 (7th Cir. 1990) (fact that ordinance regulating speech had been amended did not moot claim for declaratory relief); *Crane* v. *Logli* 1992 WL 123155, *3 (N.D.Ill.,1992), citing *Penny Saver* (Prisoner's claim for damages and declaratory relief were not mooted by transfer to different jail).[12]

Nevertheless, the case for declaratory relief is insubstantial. Without question, whether to issue a declaratory judgment is within the sound discretion of the court. See 10A C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE & PROCEDURE Civil § 2759 and n.4 (1983). A declaratory judgment is typically used where parties are uncertain of their obligations going forward, so that a party may to resolve an actual controversy to avoid being sued. *E.g., Certified*

---

fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum. *See Steel Co.* [v. *Citizens for a Better Env't*, 523 U.S. 83, 109 (1998)] ("'the mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced'") (quoting *Renne* v. *Geary*, 501 U.S. 312, 320 . . . (1991)).

*Id.* at 190-91.

[12]Kaukab relies on the undated deposition testimony from Appling, taken sometime before December 6, 2002, where he testifies that he still conducts security screening at O'Hare Airport for Argenbright. (*Id.* Ex. B.). Even disregarding this affidavit, it appears that Argenbright was still at O'Hare until September, 2002, well after the complaint was filed. Although Argenbright looks to the Amended Complaint for standing, standing, as indicated above, is determined at the time the complaint is filed. The amended complaint would be analyzed in terms of mootness.

17

*Grocers Midwest, Inc.* v. *New York Life Ins. Co.*, 814 F. Supp. 34, 36 (N.D. Ill. 1992) (determination of penalty in order to prepay mortgage note); *AC & S, Inc.* v. *Aetna Cas. & Surety Co.*, 666 F.2d 819, 822-23 (3d Cir. 1981) (determination of coverage and duty to defend insurance claims); *Kucala Enter., Ltd.* v. *Auto Wax Co., Inc.*, No. 02 C 1403, 2003 WL 21230605, at *1 (N.D. Ill. May 27, 2003) (accused infringer seeks determination of invalidity and non-infringement of patent). Ignoring these principles, plaintiff's argument blurs the distinction between whether a case is appropriate for declaratory relief and whether a case or controversy exists. Although there are cases, as illustrated by those plaintiff cites, that rely on the existence of a claim for declaratory judgment to save a case from mootness, those cases do not evaluate whether a declaratory judgment is a suitable remedy in that case as opposed to simply determining liability and what damages resulted.[13]

Here, there is one incident of unconstitutional conduct despite Kaukab's having traveled on airplanes approximately seven times between November 7, 2001 and June 24, 2002. *Accord, Lyons*, 461 U.S. at 108 ("We note that five months elapsed between [the date of the incident] and the filing of the complaint, yet there was no allegation of further unfortunate encounters between Lyons and the police."). Furthermore, plaintiff does not dispute that Congress passed the ATSA prior to her filing her instant action, which eventually resulted in the TSA taking control over passenger security screening services at the nation's airports. Finally, she submits no evidence

---

[13]At least two of the cases are consistent with the notion that declaratory judgments are suited to instances where the parties need to ascertain their rights or obligations going forward: *Wolff* v. *McDonnell*, 418 U.S. 539, 554-55 (1974) (although the injunction was not available for restoration of good time to prisoner, declaratory judgment as to the validity of prison procedures could be a predicate to a damages award or for an injunction against invalid prison regulations); *Powell* v. *McCormack*, 395 U.S. 486, 498-99 (1969) (even though an injunction or mandamus may not be necessary to obtaining Congressman's withheld salary, the court might grant declaratory relief, which could serve as a "predicate to further relief, including an injunction.").

that Argenbright continues to provide security services at O'Hare.[14] Thus, there is no realistic prospect that there will be a need to declare the rights of the parties for any future purpose. With respect to General Harris, inasmuch as this court has found above that the law was clearly established at the time General Harris allegedly failed to train, it goes without saying that to declare the rights of the parties would be superfluous.

Because declaratory relief would lend nothing other than emphasis to Kaukab's damages remedy, the court will strike and dismiss the claims for declaratory relief.

### ORDER

Wherefore, for the reasons set forth above, General Harris' motion to dismiss Kaukab's First Amended Complaint against him is denied [#12, #61-1, #61-2]. General Harris' motion to strike Kaukab's requests for declaratory relief is granted [#61-3]. Argenbright's motion to dismiss Kaukab's free exercise claims is denied [#14]. Argenbright's motion to strike [#59-1] and dismiss [#59-2] Kaukab's requests for declaratory relief is granted.

ENTER: *[signature]*
JOAN HUMPHREY LEFKOW
Dated: August 6, 2003            United States District Judge

---

[14] Kaukab points out that the ATSA leaves open the possibility of private security companies returning to passenger security screening services in a two-year pilot program at five of the nation's airports. *See* 49 U.S.C. §§ 44919-20. Based on these provisions, she asserts that there is a possibility that Argenbright may return to O'Hare Airport. This is speculation, which cannot be a basis for standing. *See Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001) ("A plaintiff's speculation that he may suffer the same injury at some point in the future is insufficient to establish standing.").